JEVAUGHN MOULTON,

      Plaintiff,

v.

GUY PROSPER, *et al.*,

      Defendants.

_____/

## ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment (the "Motion") [ECF No. 16], filed on March 13, 2019. The Plaintiff filed his Response in Opposition (the "Response") [ECF No. 24] on April 3, 2019. And the matter ripened on April 9, 2019, when the Defendants filed their Reply (the "Reply") [ECF No. 26]. The Court held a hearing on July 30, 2019, [ECF No. 42], at which the parties presented their oral arguments.

### THE FACTS

On July 8, 2014, two men committed a strong-arm robbery in Coral Springs, Florida. *See* Defs. SOF ¶ 1.[1] An eyewitness to the robbery called the police and described the robbers as tall, black, male teenagers wearing dark clothing. *See id.* Officers John Yulfo, Camille Dumornay, and Taylor Anderson of the Coral Springs Police Department responded to the call and, a few minutes later, arrived at the scene. *See id.* ¶ 3. In their efforts to locate the suspects, Officers Yulfo and Dumornay parked their vehicle at the intersection of State Road 7 and W. Sample Road—in Coral

---

[1] The Defendants' Concise Statement of Material Facts (the "Defs.' SOF") [ECF No. 17]

Springs, Florida. *See id.* ¶ 6. Officer Anderson, sitting in a separate car, waited at the same intersection. *See id.*

Earlier that night, the Plaintiff, Jevaughn Moulton, had been playing basketball with some friends in Coconut Creek. *See id.* ¶ 4; Pl.'s SOF ¶ 4.[2] Moulton, a 19-year-old black male, is almost six feet tall. *See* Defs.' SOF ¶ 8. After the game, the Plaintiff borrowed a bicycle from a friend and was riding home when he encountered the three officers on Sample Road. *See* Defs.' SOF ¶¶ 5, 8.

Seeing the Plaintiff—who was wearing dark clothing—Officer Dumornay ordered him to stop his bike and wait for the officers by the curb. *See id.* Hearing this command, the Plaintiff stopped and rested his bicycle on the ground. *See id.* But, when Officer Dumornay tried to handcuff him, the Plaintiff pulled away and began running eastbound on Sample Road. *See* Defs.' SOF ¶ 9–11. With the officers now in pursuit, the Plaintiff turned into a shopping plaza, jumped into a dumpster, and closed the lid behind him. *See id.* ¶ 10.

Unable to locate the Plaintiff, the officers called Sergeant Guy Prosper and his canine partner, Bo. *See id.* ¶¶ 3, 12. Bo is a seventy-pound Belgian Malinois trained both to "track" a suspect and, if necessary, to "apprehen[d]" him. *See id.* When so "apprehen[ding]" a suspect, Bo is trained to "bite and hold"—but not to "maul." *See id.* ¶ 12. Shortly after his arrival, Bo picked up a scent and followed it to the dumpster. *See id.* ¶ 14. As Bo approached the dumpster, he began to bark. *See id.* At this point, Sergeant Prosper met Bo at the front of the dumpster. *See id.* ¶ 16.

What (precisely) happened next is in dispute. Sergeant Prosper avers that he gave the Plaintiff two verbal warnings—by which, he says, he made clear that, if the Plaintiff refused to

---

[2] The Plaintiff's Concise Statement of Material Facts (the "Pl.'s SOF") [ECF No. 25], filed on April 3, 2019.

leave the dumpster voluntarily, he would send the dog into the dumpster after him. *See* Defs.' SOF ¶ 16. For his part, the Plaintiff admits that he heard people talking outside the dumpster,[3] but claims that he could not make out what they were saying because, as he concedes, he had his "head tucked in." Moulton Dep. 71:12. This testimony, the Plaintiff now contends, supports his view that, in fact, no warnings were given. *See* Pl.'s SOF ¶ 16.

When the Plaintiff refused to surrender, Prosper lifted the lid of the dumpster and commanded Bo to enter and apprehend him. *See* Defs.' SOF ¶ 17. As Bo jumped into the dumpster, he latched first onto the Plaintiff's head, disfiguring his ear. *See id.* ¶ 18. As the Plaintiff writhed, Bo released his head and bit into his arm. *See id.* After a brief struggle, the Plaintiff managed to release himself from the dog and to jump out of the dumpster. *See id.*

In his Response to the Motion for Summary Judgment, the Plaintiff alleges that Bo likewise jumped out of the dumpster and, seeing him, seized him by the leg. *See* Resp. ¶ 4; Defs.' SOF ¶ 18; Pl.'s SOF ¶ 18. He says that he then fell to the ground, where Bo mauled him for approximately three to five more minutes. *See* Pl.'s SOF ¶ 19. The officers eventually handcuffed the Plaintiff and, thirty seconds later, employed a "tactical release" to free Bo's grip. *See id.*; Defs.' SOF ¶ 19. As a result of the various dog bites he sustained, the Plaintiff suffered injuries over his entire body. *See* Moulton Dep. 79:11–80:13.

The Plaintiff filed suit against the Defendants on June 6, 2018, and his Complaint contains four counts: excessive force against Sergeant Prosper for the use of the dog (Count I); excessive force against Officer Anderson for failure to intervene (Count II); excessive force against Officer Yulfo for failure to intervene (Count III); and excessive force against Officer Dumornay for failure

---

[3] Specifically, the Plaintiff testified that he heard "commotion-like sound, like people talking." Moulton Dep. [ECF No. 19-4] 71:6–7.

to intervene (Count IV). *See* Compl. [ECF No. 1] at 4–11. Notably, the Complaint never alleges that Bo bit the Plaintiff after he emerged from the dumpster. To the contrary, the Complaint suggests precisely the opposite when it avers, without further elaboration, that the Plaintiff "exited the dumpster and was taken into custody by one or more [officers] for resisting arrest without violence." *Id.* ¶ 20.

## THE LAW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the burden of proving the absence of a genuine issue of material fact—and, as a result, all factual inferences are drawn in favor of the non-moving party. *See e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See*

*Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Notably, assessments of credibility—no less than the weighing of evidence—are jury questions not susceptible of disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

At summary judgment, the Court must analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). Of course, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

## ANALYSIS

The Defendants move for summary judgment on two grounds. First, they argue that, under the circumstances, Sergeant Prosper's decision to deploy the police dog was "objectively reasonable." *See* Mot. at 3–9. Second, they contend that, even if the use of the police dog was unreasonable, the officers are nonetheless entitled to qualified immunity. *See id.* at 9–18.

The Plaintiff offers three responses. First, he says that the dog's deployment was not "objectively reasonable" because: (i) the officers had no reason to fear that they'd be ambushed, *see* Resp. ¶¶ 6–9; (ii) the officers had no basis to believe that the Plaintiff was armed, *see id.* ¶¶ 10–12; (iii) the officers did not warn the Plaintiff before deploying the dog, *see id.* ¶¶ 13–16; and (iv) a strong-arm robbery is not a particularly serious crime, *see id.* ¶¶ 17–18. Second, the Plaintiff argues that the officers are not entitled to qualified immunity. *See id.* ¶¶ 19–25. And third, the

Plaintiff insists that summary judgment is inappropriate because there is a genuine dispute with respect to the mauling he now says occurred after he left the dumpster. *See id.* ¶¶ 26–30.

As these allegations make clear, the Plaintiff's claim implicates two distinct uses of the police dog. The first occurred when Sergeant Prosper lifted the lid of the dumpster and directed Bo inside—what we might call "the initial deployment." Here, the Plaintiff argues that both Sergeant Prosper's deployment of the dog and the other officers' failure to intervene in that deployment constituted unconstitutionally excessive force. *See generally* Compl. The second (allegedly improper) use of the dog occurred *after* the Plaintiff left the dumpster—what we call "the second deployment." *See* Resp. ¶ 4. Where, as here, a plaintiff's constitutional challenge implicates two discrete aspects of a police dog's deployment—an initial, and then a subsequent (or second), deployment—the Eleventh Circuit has traditionally treated the two uses separately. *See, e.g.*, *Trammell v. Thomason*, 335 F. App'x 835, 842 (11th Cir. 2009); *Edwards v. Shanley*, 666 F.3d 1289, 1295–96 (11th Cir. 2012).

## I.     The Initial Deployment

The Plaintiff alleges that the initial deployment of the police dog was unconstitutional in two ways. *First*, he claims that Sergeant Prosper acted unconstitutionally in releasing Bo into the dumpster. *See* Compl. at Count I. *Second*, he says that Officers Dumornay, Yulfo, and Anderson acted unconstitutionally in failing to intervene. *See id.* at Counts II–IV. The Defendants counter that the initial deployment was "objectively reasonable," and that, even if it wasn't, they are nonetheless entitled to qualified immunity. *See generally* Mot.

### A.  Claims Against Sergeant Prosper

The Plaintiff contends that Sergeant Prosper's decision to release the dog into the dumpster violated his right to be free from the use of excessive force. Specifically, the Plaintiff says, the

initial deployment of the dog was unconstitutional because Sergeant Prosper did not provide a warning, *see* Resp. ¶¶ 13–16; because Sergeant Prosper had no cause to fear an ambush, *see id.* ¶¶ 6–9; and because Sergeant Prosper had no reason to believe that the Plaintiff was armed, *see id.* ¶¶ 10–12.

### i. Excessive Force

This Court analyzes an officer's decision to effectuate a seizure via a police dog under the rubric of the Fourth Amendment. *See, e.g.*, *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000). "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). To adjudicate the Plaintiff's excessive force claim under the Fourth Amendment, this Court must determine "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted) (cleaned up). In assessing "objective reasonableness," the Court looks to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (the "*Graham* factors"). Under that standard, the Court must, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.*, determine whether Sergeant Prosper's decision to release Bo into the dumpster was "objectively reasonable."

Viewed in the light most favorable to the Plaintiff, the salient facts are these: After he was stopped and detained for a strong-arm robbery he did not commit, the Plaintiff ran from the police, hid in a dumpster, and closed the lid behind him—hoping, in this way, to elide the pursuing officers. Unfortunately for the Plaintiff, a police dog tracked him to the dumpster and, once there,

began barking loudly—a call that quickly led the officers to suspect that the Plaintiff was, as he turned out to be, inside that dumpster. Although he could hear a commotion outside the dumpster, the Plaintiff covered his head and refused to give himself up. Then, without warning, the dumpster lid opened, a ferocious dog jumped inside, and, after a short struggle, the dog bit him multiple times in the head, the arms, the torso, and the legs. Under these facts—gruesome and sadly unfortunate as they may be—the initial deployment of the dog did not abridge the Plaintiff's Fourth Amendment rights. To the contrary, each of the three *Graham* factors strongly supports the Defendants' position here.

*First*, the officers, as noted, were investigating a strong-arm robbery—a violent felony under Florida law. *See United States v. Bostick*, 675 F. App'x 948, 950 (11th Cir. 2017) ("[S]trong-arm robbery conviction under Fla. Stat. § 812.13 undisputedly qualifies as a violent felony."). The Plaintiff's suggestion that a strong-arm robbery is not a sufficiently violent crime to warrant the use of a police dog, *see* Resp. ¶¶ 17–18, is simply wrong. To the contrary, courts in this Circuit have upheld the use of police dogs for the apprehension of individuals suspected of *less* violent crimes. *See, e.g.*, *Craft v. Genao*, No. 6:10-CV-260-ORL-22TBS, 2012 WL 12961101, at *11 (M.D. Fla. Dec. 13, 2012) (burglary). The first *Graham* factor—the "severity of the crime"— therefore militates against a finding of unconstitutionality.

The second *Graham* factor—the "immedia[cy of the] threat to safety"—likewise weighs in favor of the Defendants. The officers never got a chance to check the Plaintiff for weapons before he fled. After he ran, as we now know, the Plaintiff concealed himself in a closed dumpster—thus preventing the officers from gauging his dangerousness, observing his demeanor, or following his movements. In this way, the officers found themselves suddenly at a tactical disadvantage—vulnerable to the Plaintiff's whim if he, on the one hand, decided to open the lid

and attack, and susceptible to ambush, on the other, if they took the initiative and opened the lid themselves.[4] A reasonable officer at the scene could thus very easily have concluded that the Plaintiff posed an "immediate threat to [their] safety." Notably, where, as here, a suspect in a violent felony has fled arrest and, during flight, concealed himself from view, courts in this Circuit have not hesitated to uphold an officer's use of non-lethal force. *See, e.g.*, *Craft*, 2012 WL 12961101, at *11. And the use of a police dog, the Eleventh Circuit has told us, constitutes non-lethal force. *See Edwards*, 666 F.3d at 1295.

The third *Graham* factor—whether the suspect "is actively resisting arrest or attempting to evade arrest by flight"—clearly favors the officers here. When the officers tried to handcuff the Plaintiff, he fled from their lawful commands; before they could locate him, he concealed himself in a closed dumpster; and, by his own admission, he refused to surrender despite hearing voices outside that dumpster. Put another way, the Plaintiff *both* "actively resist[ed] arrest" *and* "evade[d] arrest by flight."

Against all this, the Plaintiff contends that the initial deployment of the dog was objectively unreasonable because Sergeant Prosper failed to issue a warning. *See* Resp. ¶¶ 13–16. But neither the Supreme Court nor the Eleventh Circuit has imposed a hard-and-fast rule requiring warnings before *every* police dog deployment. To the contrary, the Eleventh Circuit has affirmed an officer's deployment of a police dog *even without* the issuance of a warning *See Grimes v. Yoos*, 298 F. App'x 916, 923 (11th Cir. 2008) ("The fact that [the officer] failed to warn [the burglary suspect]

---

[4] For these same reasons, the Court finds unreasonable the Plaintiff's unsupported, post-hoc suggestions that (1) the officers could not—for reasons the Plaintiff does not explain—have feared an ambush, *see* Resp. ¶¶ 6–9, and that (2) the officers should have determined—the Plaintiff never says how or why—that he was unarmed, *see id.* ¶¶ 10–12.

of his and the police dog's presence does not alter the conclusion that the use of force was objectively reasonable.").

The officers here were chasing a man they suspected of having just committed a violent felony—a man who had fled from their grasp, disregarded their unambiguous commands, secluded himself in a closed dumpster, and refused to emerge despite their presence. At this point, as this Court has explained, the officers found themselves at a (no-doubt disconcerting) tactical disadvantage and could have reasonably concluded that the unwarned—that is, surprise— deployment of a police dog was the most expedient means of retaking that advantage. The Court cannot (and will not) employ "20/20 . . . hindsight," *Graham*, 490 U.S. at 396, to reassess this otherwise-reasonable decision now.

The Court also finds unpersuasive the Plaintiff's view that, to subdue him, the officers should have used some alternative form of non-lethal force. *See* Resp. at 6. In his Response, the Plaintiff helpfully suggests that, perhaps, pepper spray or a taser gun might have done the trick just as effectively—and, he says, less painfully. *See id.* But the Eleventh Circuit has made plain that, as with pepper spray and taser guns, an officer's use of a police dog constitutes *non-lethal* force. *See Edwards*, 666 F.3d at 1295. And it has repeatedly cautioned against analyzing the degree of an officer's forcefulness in a vacuum. Instead, district courts should analyze "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)).

Each of these factors supports Sergeant Prosper's use of the dog here. *First*, Sergeant Prosper deployed the dog to track and then subdue a suspect in a violent felony who had fled from

police, secreted himself in an enclosed—and unexposed—space, and refused to surrender. The "need for the application of force" was therefore unmistakable. *Second*, the force Sergeant Prosper employed was not inconsistent with that need: As noted, he deployed a non-lethal police dog to subdue a recalcitrant suspect who had fled from the officers, hidden himself in a dumpster, and refused to come out. *Third*, although the Plaintiff's injuries were serious, they were not life-threatening. Moreover, it is not entirely clear from this record how much of those injuries he sustained in the dumpster—that is, as a result of the initial deployment—and how many were inflicted after he jumped out. *Finally*, nothing in the record suggests that Sergeant Prosper acted in any way "maliciously or sadistically" in initially deploying the dog.

Put simply, the "Constitution tolerates some uses of a dog under these conditions." *Edwards*, 666 F.3d at 1295. The "force necessarily caused by using a dog to track a fleeing suspect is reasonably tailored to the risk that a fleeing suspect presents" when he does not surrender. *Id*. "The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable." *Menuel v. City of Atlanta*, 25 F.3d 990, 996–97 (11th Cir. 1994) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1148–50 (7th Cir. 1994)). And, on the specific facts of this case, Sergeant Prosper's deployment of the dog "was reasonable." *Id*.

In either event, the Court finds unpersuasive the Plaintiff's argument that a dog is necessarily more dangerous than, for instance, a taser. *See, e.g.*, *Salgado v. City of W. Miami*, 85 F. Supp. 3d 1332, 1336 (S.D. Fla. 2015) (death caused by taser). And, of course, the "logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *United States v. Martinez-Fuerte*, 428 U.S. 543, 557 (1976).

Finally, the Plaintiff's efforts to distinguish *Crenshaw*,[5] *Jones*,[6] *Craft*,[7] *Grimes*,[8] *Pace*,[9] and *Dawe*[10] on the ground that those cases involved "[h]eavily [w]ooded [t]errain," *see* Resp. at 4–6, is unavailing. At oral argument, Plaintiff's counsel explained that he did not mean, by this argument, to suggest that the constitutionality of a police dog's deployment is somehow contingent upon the "woodenness" of the surroundings. Instead, he means only that the propriety of a dog's deployment depends, to a large extent, on whether the suspect's location has been independently identified. And where, so the argument goes, that location is already known to the officers, the dog's deployment is *ipso facto* unnecessary—and thus unconstitutional.

There are at least two fundamental problems with this argument. *First*, if the Eleventh Circuit intended to require, as a precondition to the deployment of a police dog, the *ex ante*, non-verification of the suspect's location, it would have said so in the many such cases it has decided. And, of course, that it has not said so is, at the very least, dispositive on the question of whether such a requirement constitutes "clearly established law" for purposes of Sergeant Prosper's argument that he is entitled to qualified immunity. *See Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." (cleaned up)).

*Second*, the Plaintiff's argument ignores the facts of this case, which show that the Plaintiff's presence in the dumpster was "known" to the officers *only* because of the dog's

---

[5] *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009).
[6] *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017).
[7] *Craft v. Genao*, No. 6:10-CV-260-ORL-22TBS, 2010 WL 12961101 (M.D. Fla. Dec. 13, 2012).
[8] *Grimes v. Yoos*, 298 F. App'x 916, 923 (11th Cir. 2008).
[9] *Pace v. City of Palmetto*, 489 F. Supp. 2d 1325 (M.D. Fla. 2007).
[10] *Dawe v. Rogers*, No. 8:09-CV-620-T-30AEP, 2010 WL 271435 (M.D. Fla. Jan. 15, 2010).

barking—and not because they had seen him enter it. *See* Defs.' SOF ¶ 14. In this respect, there is no reason to believe that the use of the dog to apprehend the Plaintiff in the dumpster was any less appropriate than the officer's similar deployment of a police dog in *Baker v. Cohen*, No. 09-60103-CIV-Jordan, 2010 WL 3385266, at *7 (S.D. Fla., Aug. 5, 2010)—where the dog had alerted to a parked car in a parking lot. *See id.* To the contrary, if the dog's deployment into the car in *Baker* —a smaller space—was proper, the deployment into the dumpster here—a much larger space— was likewise constitutional.

In short, Sergeant Prosper's decision to deploy the police dog without warning was objectively reasonable under the circumstances. Taking the facts in the light most favorable to the Plaintiff—and drawing all reasonable inferences in his favor—the Plaintiff cannot point to any genuine issue of material fact that would render summary judgment inappropriate.

### ii.    Qualified Immunity

In any case, even if the initial deployment were unconstitutional, Sergeant Prosper would nonetheless be entitled to qualified immunity.

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester*, 208 F.3d at 925 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To qualify for the immunity, a government official must show that the challenged actions were committed within the scope of his discretionary authority. *See*

*Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). If he can do so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.

To overcome the qualified immunity defense, a plaintiff must show that the officer deprived him of a constitutional right that was "clearly established" at the time of the alleged offense. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This requirement "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *id.* at 206. For purposes of qualified immunity, only decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Supreme Court of Florida constitute "clearly established" law. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

Under some circumstances, however, where "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," the official is not entitled to the defense of qualified immunity. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). This is because "[t]he easiest cases don't even arise." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citation omitted). "There has never been," for instance, "a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages." *Id.* (citation omitted). To meet this exception to the "clearly established law" requirement—or, put another way, to show that the unconstitutionality of the official's conduct was "readily apparent"—a plaintiff must demonstrate that the conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Mattox*, 127 F.3d at 1419. But, as the Eleventh Circuit has made clear, this exception applies only where "every reasonable officer in [the official's] position [would] conclude the force was unlawful." *Post v.*

*City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *as amended*, 14 F.3d 583 (11th Cir. 1994).

The Plaintiff does not dispute that, at the time of Bo's initial deployment, the officers were exercising their discretionary functions. *See* Resp. at 10. To circumvent the Defendant's entitlement to qualified immunity, the Plaintiff therefore bears the burden of establishing that the officers violated his "clearly established" constitutional right to be free from the excessive use of force. *See Saucier*, 533 U.S. at 201.

But the Plaintiff has identified no case—and the Court has found none—for the proposition that an officer who is chasing a (suspected) violent felon violates that suspect's constitutional rights when he deploys a police dog without warning.[11] To the contrary, the Eleventh Circuit has routinely held, under relatively similar circumstances, that deploying officers are entitled to qualified immunity—even without a warning. *See, e.g.*, *Grimes*, 298 F. App'x at 923 (finding the use of police dog objectively reasonable despite the lack of warning and, in the alternative, concluding that officer was entitled to qualified immunity); *Trammell*, 335 F. App'x at 843 ("Accordingly, we will affirm the District Court's determination that Dorough is entitled to qualified immunity for his conduct in allegedly releasing Yacco without a warning.").

For his part, the Plaintiff identifies three cases in which a federal court concluded that an officer who deployed a police dog without warning was *not* entitled to qualified immunity. *See*

_____

[11] And the narrower exception to qualified immunity—conduct whose unconstitutionality is "readily apparent"—is plainly inapplicable here. After all, for this exception to apply, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Priester*, 208 F.3d 919 at 927 (citing *Lassiter v. Alabama A&M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)). Because the Plaintiff can identify no case that in any way "compels" the result he seeks, he (almost by definition) cannot avail himself of this exception.

Resp. ¶¶ 13–17 (citing *Chatman v. Navarro*, No. 14-CV-62793-BLOOM, 2016 WL 9444164, at *4 (S.D. Fla. July 1, 2016); *Trammell*, 335 F. App'x at 841; *Priester*, 208 F.3d at 919). But, upon closer inspection, each of these cases either is unhelpful to the Plaintiff or else supports the Court's view that Sergeant Prosper is entitled to qualified immunity.

In *Chatman*, Judge Bloom held that an officer who allowed a police dog to maul a suspect for fifteen minutes was not entitled to qualified immunity. *See Chatman*, 2016 WL 9444164, at *7. The officer in that case had stopped a man he suspected of shoplifting. *Id.* at *1. When the man fled, the officer used a police dog to chase the man into a bush and, once there, to subdue him. *Id.* As here, the suspect claimed to have heard no warning, and the officers inexplicably allowed the dog to maul him for fifteen minutes. *Id.* In her order denying the officer's request for qualified immunity, Judge Bloom made clear that her decision as to whether "qualified immunity applies . . . depends on resolving the parties' dispute over the *amount of time* [the officer] allowed [the dog] to bite [the suspect]." *Id.* She never held, however, that the officer's *initial* deployment of the dog was unconstitutional—or that the officer was not entitled to qualified immunity *for that deployment*. And, of course, because the officer's decision not to issue a warning could only implicate the propriety—that is, the constitutionality—of the *initial* deployment, the lack of a warning had absolutely nothing to do with Judge Bloom's conclusion.

Likewise, in *Trammel*, a 57-year-old white man was standing in his friend's backyard as a group of police officers conducted a search for a burglary suspect they knew to be a 23-year-old black man. *See Trammell*, 335 F. App'x at 837. Without warning, the officers released a dog on the 57-year-old and then proceeded to watch as the dog mauled the man for a "significant period of time." *See id.* at 844. Despite the lack of a warning—not to mention the dual facts that, under *Graham*, the crime in question was a non-violent felony and the mauled victim could not have

committed it—the officer "[wa]s entitled to qualified immunity for his conduct in allegedly releasing [the dog] without a warning." *Id.* at 843. As in *Chatman*, the court rejected the officer's request for qualified immunity *only* on the question of whether he had failed to remove the dog within a reasonable time. *See id.* at 844.

*Chatman* and *Trammel* thus stand for the proposition that qualified immunity may be inappropriate where there is a genuine dispute about the *duration* of a police dog's deployment. In this way, both are entirely inapposite to the question at issue here: whether Sergeant Prosper's *initial* decision to deploy the dog was reasonable.

Finally, in *Priester*, the officers suspected the plaintiff of committing a burglary. *See Priester*, 208 F.3d at 923. When the officers shined a light onto his face, the plaintiff immediately gave himself up and raised both hands up into the air. *Id.* The officers then instructed the plaintiff to lie down on the ground. When the plaintiff asked "why?" the officers explained that, if he did not, they would release their dog. *See id.* Hearing this, the plaintiff acquiesced and laid down on the ground. *See id.* But, despite the plaintiff's unambiguous compliance, the officers sadistically released the dog anyway and, while pointing a gun at the plaintiff's head and directing him not to resist, allowed the dog to attack the plaintiff "for an eternity." *Id.* In the court's view, on this unique set of facts, a reasonable jury could conclude that the officer had "used an objectively unreasonable amount of force and violated Plaintiff's Fourth Amendment rights." *Id.* at 924.

*Priester*, then, did not implicate any of the salient details at issue here: a violent felony; a fleeing perpetrator; a hidden suspect; a tactical disadvantage. In this respect, far from "clearly establish[ing]" that Sergeant Prosper's decision to *deploy* Bo was unconstitutional, *Priester* stands only for the limited—and somewhat self-evident—proposition that, where a suspect obeys an officer's demands and lies down compliantly on the ground, that officer may not then deploy a

police dog to maul the suspect anyway—all while holding a gun to the suspect's head and forbidding him from any resistance. *Priester* thus does not help the Plaintiff here.

******

Even without a warning, then, Sergeant Prosper's decision to deploy a police dog to subdue a suspected violent felon who had fled from the police and who was hiding out in a closed dumpster was "objectively reasonable"—and thus perfectly consistent with the strictures of the Fourth Amendment. Alternatively, even if Sergeant Prosper's initial deployment of the dog were unconstitutional, he would nevertheless be entitled to qualified immunity because no "clearly established" law precluded it.

### B. Claims Against Officers Dumornay, Anderson, and Yulfo

The Plaintiff claims that Officers Dumornay, Anderson, and Yulfo are liable for failing to intervene in Sergeant Prosper's initial deployment of the dog. *See* Compl. at 6–11. Under certain circumstances, an officer may be liable for failing to intervene when another officer is found to have used excessive force. *See Ensley v. Soper*, 142 F.3d 1402, 1407–08 (11th Cir. 1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable . . . ."); *see also Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996); *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir. 1986); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441–42 (11th Cir. 1985). To be liable under a failure-to-intervene theory, the officer must be "in a position to intervene and fail[] to do so." *Priester*, 208 F.3d 919 at 924–25 (citation omitted).

But, to prevail on his failure-to-intervene claims, the Plaintiff must establish that an underlying constitutional violation occurred in the first place. "Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed."

*Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). Because Sergeant Prosper's initial deployment of the dog violated none of the Plaintiff's constitutional rights, Officers Dumornay, Anderson, and Yulfo are likewise not liable for failing to stop that deployment.

## II.    The Second Deployment

In an argument he makes for the first time in his Response to the Defendants' Motion for Summary Judgment, the Plaintiff contends that, after he emerged from the dumpster, Bo mauled him for up to five-and-a-half minutes—the last thirty seconds of which, he says, occurred after he had been handcuffed. *See* Resp. ¶¶ 2, 4. According to the Plaintiff's Response, despite this protracted (and horrific) post-arrest assault, the officers did nothing to release the dog—an inaction that led directly to a four-day stint in the hospital. *See id.* ¶ 4.

Unfortunately for the Plaintiff, his Complaint makes absolutely no mention of any attack outside the dumpster. Quite to the contrary, the Complaint alleges that, aside from the Plaintiff's (uneventful) arrest, nothing of note occurred after he emerged from the dumpster. In pertinent part, it avers only that "PLAINTIFF exited the dumpster and was taken into custody by one or more DEFENDANTS for resisting arrest without violence, contrary to Florida Statute 843.01, and resisting arrest with violence, contrary to Florida Statute 843.02." Compl. ¶ 20.

It is well-established in this Circuit that a "plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). Because a plaintiff has an obligation to give the defendant fair notice of the claims against him, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), courts are bound by the pleadings before them. Put another way, facts and theories not raised in the pleadings are not properly considered on motions for summary judgment. *See Ivax LLC v. Celgene Corp.*, No. 12-61917-CIV, 2013 WL

12085972, at *2 (S.D. Fla. Mar. 7, 2013) (citations omitted). Unsurprisingly, then, courts in this Circuit routinely exclude evidence—and refuse to consider arguments—when the allegations that evidence (or those arguments) supports were not included in the pleadings. *See id.*; *Wu v. Thomas*, 996 F.2d 271, 275 (11th Cir. 1993) (affirming trial court's exclusion of evidence because allegations were not asserted in the complaint); *Leathers v. State Farm Mut. Auto. Ins. Co.*, No. 1:12-CV-00198-SCJ, 2013 WL 12121324, at *5 (N.D. Ga. Aug. 28, 2013) ("As this new factual allegation is raised for the first time in response to Defendants' motion for summary judgment, it will not be considered."). In sum, a plaintiff must seek leave to amend his complaint *before* the court can consider his new factual allegations at summary judgment. *See Ivax LLC*, 2013 WL 12085972, at *2.

But the Plaintiff did not amend his Complaint within the Court's deadline for doing so. *See* Scheduling Order [ECF No. 8] at 1 (setting forth amendment deadline of August 31, 2018). Nor did he ever seek leave to amend his Complaint after that deadline had passed. What's worse, when the parties' factual discovery revealed this alternative theory of liability, the Plaintiff made no effort to add this allegation to his pleadings. Indeed, the Plaintiff failed to seek leave to amend his Complaint even *after* the Defendants argued, in their Reply to the Motion for Summary Judgment, *see* Reply at 1,[12] that the Court could not consider the second deployment because the Plaintiff had failed to allege the incident in his Complaint. Most notably, at the July 30, 2019 hearing on this Motion, the Plaintiff conceded that, by then, it was too late to amend his Complaint.

The Plaintiff's Complaint unambiguously avers only that the initial deployment of the dog violated his constitutional rights. *See* Compl. ¶ 17–18. And a fair reading of the Complaint strongly suggests that *nothing* of note occurred after the Plaintiff left the dumpster. Compl. ¶ 20. Being

---

[12] The Defendants filed their Reply on April 9, 2019.

bound by that Complaint, the Court may not consider the Plaintiff's belated arguments about the

second deployment.

******

Accordingly, the Court hereby

**ORDERS and ADJUDGES** that the Defendants' Motion for Summary Judgment [ECF

No. 16] is **GRANTED** as follows:

1. An order of final judgment shall be entered separately.

2. The Clerk of Court is instructed to **CLOSE** this case.

3. Any pending motions are **DENIED as moot.**

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 11th day of September 2019.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record